**In re BLUE LAKE FOREST PRODUCTS, INC., a California corporation, Debtor.**

**The HOOPA VALLEY TRIBE, a federally-recognized Indian tribe, on its own behalf and as parens patriae for its members, Plaintiff,**

v.

**BLUE LAKE FOREST PRODUCTS, INC., a California corporation, et al., Defendants.**

No. C–91–1911–SBA.
Bankruptcy No. 91–10333.
Adv. No. 91–1108.

United States District Court, N.D. California.

July 15, 1992.

Thomas P. Schlosser, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., for plaintiff.

Jeffrey Druckman, Miller, Nash, Wiener, Hagen & Carlsen, Portland, Or., Walter J. Carter, Mitchell, Dedekam & Angell, Eureka, Cal., for Hongkong and Shanghai Banking Corp., Ltd.

Albert N. Kennedy, Tonkon, Torp, Marmaduke & Booth, Portland, Or., Richard A. Smith, Harland & Gromala, Eureka, Cal., for Blue Lake Forest Products, Inc.

Patricia A. Cutler, Jerome E. Matthews, Keker & Brockett, San Francisco, Cal., U.S. Trustees.

## AMENDED ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (SUPERSEDES ORDER FILED MARCH 18, 1992)

ARMSTRONG, District Judge.

This case arises out of a transaction for the sale of logs owned by the United States in trust for the plaintiff Hoopa Valley Tribe ("the Tribe") to defendant Blue Lake Forest Products, Inc. ("Blue Lake"). The timber at issue was cut from a portion of trust land of the Hoopa Valley Reservation known as the Pine Creek L timber sale area. The principal dispute before the court is between the Tribe and defendant The Hongkong and Shanghai Banking Corporation Limited ("the Bank"), which had a security interest in Blue Lake's inventory, as to the proceeds from Blue Lake's sale and processing of the logs.

The Tribe has moved for summary judgment on the First Claim of the Complaint. Blue Lake filed a statement of nonopposition to the motion for summary judgment. Having carefully considered all of the papers submitted by the parties, the Tribe's motion for partial summary judgment is hereby GRANTED.

## BACKGROUND

The Hoopa Valley Tribe of the Hoopa Valley Reservation, California is a federally-recognized Indian tribe. The Hoopa Valley Indian Reservation was set apart by the United States in 1864 within the ancestral homeland of the Hoopa Valley Tribe. The Reservation boundaries were first delineated by executive order in 1876. Pursuant to the Hoopa–Yurok Settlement Act, 25 U.S.C. § 1300i, *et seq.*, the present Hoopa Valley

Reservation was separated from other Indian lands in 1988. The Act provided that, upon fulfillment of certain conditions, "the unallotted trust land and assets of the Hoopa Valley Reservation shall thereafter be held in trust by the United States for the benefit of the Hoopa Valley Tribe." 25 U.S.C. § 1300i–1(b). That provision took effect on December 7, 1988.

The Hoopa Valley Development Enterprise, formerly known as Hoopa Valley Development Corporation, is a wholly-owned subordinate body of the Tribe. The Enterprise oversees a number of Reservation economic activities including its logging company, Hoopa Forest Industries ("HFI").

The Department of the Interior's Bureau of Indian Affairs regulates and oversees the protection, development and production of tribal timber. General authority for commercial logging on Indian reservations was granted by act of Congress in 1910, 36 Stat. 855, 857, which, as amended, is codified at 25 U.S.C. § 407. That section provides:

> Under regulations prescribed by the Secretary of the Interior, the timber on unallotted trust land in Indian reservations or on other land held in trust for tribes may be sold in accordance with the principles of sustained-yield management or to convert the land to a more desirable use. After deduction, if any, for administrative expense under section 413 of this title, the proceeds of the sale shall be used—
> (1) As determined by the governing bodies of the tribes concerned and approved by the Secretary, or
> (2) In the absence of such a governing body, as determined by the Secretary for the tribe concerned.

The Interior Department's General Forest Regulations governing the management of Indian forest lands cite as one of their objectives "[t]he development of Indian forests by Indian people to promote self-sustaining communities, so that Indians may receive from their own property not only the stumpage value, but also the benefit of whatever labor and profit it is capable of yielding." 25 CFR 163.3(d). "Stumpage value" of Indian timber is defined as "the value of uncut timber as it stands in the woods." 25 CFR 163.1.

The General Forest Regulations require that contract forms approved by the Secretary be used for large timber sales such as Pine Creek L. 25 CFR 163.12. The Interior Department's published Standard Provisions are part of those approved forms.

On June 27, 1990, a multi-year Timber Contract for the Sale of Estimated Volumes covering the Pine Creek L logging unit on tribal lands of the Hoopa Valley Indian Reservation was entered into between the Tribe, as seller, HFI, as purchaser, and the Bureau of Indian Affairs, Sacramento Area Director, as approving officer ("The Timber Sale Contract"). The Timber Sale Contract recites that it is made under authority of 25 U.S.C. § 407 and in accordance with the regulations of 25 CFR Part 163 and subject to the "attached part B, Standard Provisions."

Section B2.1 of the Timber Sale Contract Part B Standard Provisions states: "Title to the timber covered by the contract shall not pass to the Purchaser until it has been scaled, *paid for*, and removed from the contract area." (Emphasis added).

Effective July 1, 1990, HFI and its parent company, Hoopa Valley Development Enterprises, entered into a Log Purchase Agreement with Blue Lake. The Log Purchase Agreement was signed one day after the Timber Sale Contract. Paragraph 2 of the Log Purchase Agreement provided:

> No provision of this Agreement will be interpreted or enforced in any manner which violates Title 25 U.S.C. § 407, or any other provision of federal law, or the regulations established by the Secretary of the Interior for Indian timber management found in Part 163 of Title 25, Code of Federal Regulations, which laws and regulations are incorporated herein.

Between July 1, 1990 and October 31, 1990, HFI cut, scaled and delivered to Blue Lake a net volume of 11,565,120 board feet of Reservation timber. Stumpage for deliveries through August 31, 1990 was paid for. However, stumpage for deliveries

made in September and October 1990, in the amount of $954,248, remains unpaid.

On February 19, 1991, Blue Lake filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On that date, approximately 1–½ to 2 million board feet of logs from the Hoopa Valley Reservation were located on Blue Lake's premises. The logs at issue were branded and marked with red paint to indicate their origin on the Hoopa Valley Indian Reservation. Rejecting requests that they cease cutting logs from the Hoopa Reservation, Blue Lake thereafter fully processed the Reservation-origin logs through its mill.

On the day following the filing of Blue Lake's Chapter 11 petition, the United States Bankruptcy Court granted Blue Lake's Motion for Authority to Enter Stipulated Order Providing Adequate Protection and Authorizing Obtaining of Credit. The Stipulated Order noted the existence of the Hoopa claims and provided that all payments by Blue Lake to the Bank would be subject to the same claims that existed against logs possessed by Blue Lake.

The Bank had loaned funds to Blue Lake since 1987 pursuant to various credit agreements. It is undisputed that the Bank at all relevant times had a perfected security interest in Blue Lake's current and after-acquired inventory.

## DISCUSSION

■ The Tribe seeks a judgment establishing that its rights to the proceeds from Blue Lake's processing and sale of the logs for which payment to the Tribe was not made are superior to those of the Bank. The Bank contends that its rights to the proceeds are superior to those of the Tribe regardless of whether title to the logs remained in the United States in trust for the Tribe.[1]

■ The Bank's position is that federal laws governing the alienation of Indian timber do not conflict with those provisions of the U.C.C. relating to an "innocent" third-party lender like the Bank and that the Bank is therefore entitled to the proceeds as a "good faith purchaser" under U.C.C. § 2–403(1). The Tribe contends that the federal laws which restrict the alienation of Indian timber necessarily preclude a third party such as the Bank from obtaining rights, superior to the Tribe's, to the proceeds from the sale and processing of those logs. The Tribe argues that it prevails even if federal law regarding the alienation of Indian timber does not preempt the application of U.C.C. principles to this case, because the Bank, in any event, is not entitled to "good faith purchaser" status under U.C.C. § 2–403(1).

It is the Bank's analysis that falls short. Citing no authority for the application of U.C.C. good-faith purchaser principles to disputes involving Indian trust property,[2] the Bank argues that those principles accord the Bank priority over the Tribe because they "do not conflict with" federal

---

**1.** The court holds that title to the logs for which payment was never made remained at all times in the United States in trust for the Tribe. The court rejects, and indeed does not follow the logic of, the Bank's suggestion in footnote 3 of its Supplemental Memorandum that, notwithstanding the government-required language to the contrary, title may have passed from the United States because of the statement in paragraph 23 of the Log Purchase Agreement that "[s]tumpage shall be paid for immediately upon passage of title." The court does not see how such language indicates either an intention of the Tribe to pass title to Blue Lake before payment was made or a contradiction of the government prescribed language rendering passage of title contingent upon payment.

**2.** The Bank notes that the court applied *other* U.C.C. principles to a dispute involving Indian timber in *In re Humboldt Fir, Inc.,* 426 F.Supp. 292 (N.D.Cal.1977), *aff'd,* 625 F.2d 330 (9th Cir. 1980). But in doing so the court said that state laws may not apply to a dispute involving tribal trust property, 426 F.Supp. at 296, and that the application of U.C.C. principles was appropriate only "to the extent that [such application] does not conflict with the Federal interest in developing and protecting the use of Indian resources." 426 F.Supp. at 297. In *Humboldt Fir,* the U.C.C. provisions were considered because, unlike here, they *supported* the tribe's position. *Compare Pajarito American Indian Art, Inc. v. Lyon,* 7 B.R. 343 (D.Ariz.1980) (Because federal statutes barred the sale of Sioux Indian ghost dance shield which had eagle feathers attached to its face, the Uniform Commercial Code did not control and original owners, not subsequent purchasers, prevailed).

laws restricting the alienation of Indian timber. But the very premise of the Bank's position is that the U.C.C. brings about a result that is *different* from the result that would arise if U.C.C. principles were not applied. The Bank's logic is untenable: the Bank first applies U.C.C. principles as the vehicle for *determining* whether there is a conflict between U.C.C. principles and federal laws regulating the alienation of Indian timber and concludes from those principles that there is no such conflict; the Bank then applies the U.C.C. to reach its conclusion that its rights to the proceeds are superior to those of the Tribe, conceding implicitly, however, that without the benefit of U.C.C. principles, one would not reach that result.

Endemic to the Bank's analysis is the implicit assumption that the court should apply the same analysis in this case as it would apply in a case not involving tribal trust property. Without expressly saying as much, the Bank effectively asks the court to accept the proposition that if, say, "Boise–Cascade" were substituted for the Tribe as the selling party in this case and the U.C.C. was interpreted to render the Bank's rights superior to the rights of Boise–Cascade, then the Bank would necessarily also prevail over the Tribe.

■ The court cannot accept that logic. To do so would be to disregard the principle, ensconced in American jurisprudence, that tribal trust property is afforded extraordinarily heightened protection. That heightened protection is justified by the unique historical origins of tribal sovereignty and the federal government's special trust relationship with the tribes. *See generally Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 296 (N.D.Cal.1977), *aff'd*, 625 F.2d 330 (9th Cir.1980); F. Cohen's Handbook of Federal Indian Law, 508–510 (1982 ed.).

In particular, section 4(b) of Pub.L. [83–]280, 28 U.S.C. § 1360(b), which the Bank ignores in its papers, provides that nothing in Congress' authorizing state courts to adjudicate civil controversies involving Indians "shall authorize the alienation, encumbrance, or taxation of any real or personal property ... belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States...." The United States Supreme Court has described section 1360(b) as establishing an "express prohibition" of any alienation, encumbrance, or taxation of any tribal trust property. *Bryan*, 426 U.S. at 391, 96 S.Ct. at 2112. The Supreme Court has also said that section 1360(b) can be read as prohibiting state courts "from applying state laws or enforcing judgments in ways that would *effectively result in* the 'alienation, encumbrance, or taxation' of trust property." *Id.* (Emphasis added.)

It could be argued, to be sure, that this statute does not apply to a dispute, such as this, over proceeds from the inventory of a non-tribal debtor—although, as indicated, the Bank has not bothered to acknowledge the statute much less to advance an argument for its inapplicability to this case. It could be argued that the statute's prohibition against a *state* court's application of state laws effecting the alienation or encumbrance of trust property does not prohibit *federal* courts from doing the same thing, although there would seem to be little basis for such a distinction. *See Humboldt Fir*, 426 F.Supp. at 296 ("Where a dispute involves trust or restricted property, the state may not adjudicate the dispute *nor may its laws apply*.") (Emphasis added).[3] It could also be argued that granting a secured party priority in the proceeds from tribal trust property obtained by the secured creditor's debtor without payment to the Tribe does not technically effect the "alienation" or "encum-

---

**3.** Nor would it make sense to escape the scope of section 1360(b) by purporting to apply a "federal" law of contracts incorporating U.C.C. principles because incorporating such state-based principles is only appropriate "to the ex-

tent that [they do] not conflict with the Federal interest in developing and protecting the use of Indian resources." *Humboldt Fir,* 426 F.Supp. at 297.

brance" of tribal trust property. The Bank's security interest, after all, was in Blue Lake's property, not the Tribe's or the federal government's, and granting the Bank priority to the proceeds does not technically preclude the Tribe's right of action against Blue Lake for compensation for its acquisition of logs as to which title never passed.

The Supreme Court, however, has construed Section 1360(b) as precluding the enforcement of judgments that "effectively result" in the alienation or encumbrance of tribal trust property. *Bryan*, 426 U.S. at 391, 96 S.Ct. at 2112. And it is at least arguable that enforcing a state law lien so as to give the Bank priority over the Tribe in proceeds from logs as to which title, under federal law, never left the United States in trust for the Tribe (and where the logs, themselves, no longer exist), is the "effective" alienation of tribal trust property.

At worst, section 1360(b)'s applicability here is uncertain. Indeed, the Supreme Court has described the statute as "admittedly ambiguous." *Id.* at 392, 96 S.Ct. at 2112. But the Supreme Court has also said that

> in construing this 'admittedly ambiguous' statute, *Board of Comm'rs v. Seber*, 318 U.S. [705] at 713, 63 S.Ct. [920] at 925 [87 L.Ed. 1094], we must be guided by that 'eminently sound and vital canon,' *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 1797, 48 L.Ed.2d 274 (1976), that 'statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918). [Other citations omitted.]

*Id.* Resolving its doubts regarding section 1360(b) in favor of the Indians, this court concludes that the Bank is precluded from asserting over the Tribe its priority in the proceeds from the logs, notwithstanding that the Bank *may* have prevailed as a "good faith purchaser" if U.C.C. principles had been applied.[4]

The court notes that to the extent this holding favors Indian property rights over "innocent" third parties, it is consistent with a long line of judicial decisions that have done the same. *See Oneida Indian Nation of New York State v. Oneida County*, 434 F.Supp. 527 (N.D.N.Y.1977) (good faith in acquiring property will not render good a title which otherwise is not valid for failure to comply with the Indian Nonintercourse Act), *aff'd*, 719 F.2d 525 (2d Cir.1983), *aff'd in relevant part, Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Under the supremacy clause, state law time bars such as adverse possession and laches do not apply of their own force to Indian land title claims); *Mohegan Tribe v. State of Connecticut*, 528 F.Supp. 1359 (D.Conn.1982) (where state received title to Indian lands from private persons whose original grant was void, state's title was void); *Cayuga Indian Nation of New York v. Cuomo*, 771 F.Supp. 19 (N.D.N.Y.1991) (Indians could not be precluded from asserting invalidity of agreement under which they had purportedly ceded lands to the state of New York on grounds that the land had been occupied by generations of owners over a 175–year period and that real estate titles in large portion of two counties would be disrupted and landowners "irreparably harmed"). To the extent this holding implies a "preemption" of state commercial laws, such preemption is supported not only by the federal government's pervasive regulation of the alienation of Indian trust property but also by the Supremacy Clause of the United States Constitution which dictates that state law cannot supersede federally created rights, a principle "applied with especial vigor to the question of Indian title as a result of the federal government's

---

**4.** The court does not formally reach whether or not the Bank would have so prevailed under the U.C.C. However, the court is inclined to agree with the Tribe that the unique heightened restrictions governing the alienation of Indian trust property rendered the title passed to Blue Lake void, rather than voidable, and that the Bank would therefore not be entitled to "good faith purchaser" status under U.C.C. § 2–403(1) even if the U.C.C. were applicable here.

'unique obligation toward the Indians.'" *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.*, 418 F.Supp. 798, 804 (D.R.I.1976) quoting *Morton v. Mancari*, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) ("The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of preemption that have emerged in other areas of the law.")

CONCLUSION.

Accordingly, plaintiff's motion for summary judgment on the First Claim of the Complaint is hereby GRANTED. Blue Lake obtained and processed logs from the Pine Creek L timber sale of the Hoopa Valley Indian Reservation, having a stumpage value of $954,248, title to which remained in the United States in trust for the Tribe. Plaintiff is entitled to recover the value of those logs, now held by the Bank in the form of proceeds, without prejudice to the parties' ability to establish in further proceedings before this court that the recovery for the logs and their products should be less than or greater than the stumpage value.

As there remains unresolved the issue of the precise dollar amount to which the Tribe is entitled, the parties shall appear for a status conference on Thursday May 21, 1992, at 3:45 p.m. The parties shall submit status conference statements, or a joint one if possible, in accordance with the Local Rules, not less than ten days prior to the status conference. Should the remaining issue be resolved before that date, with judgment entered accordingly, the status conference will be vacated.

IT IS SO ORDERED.